IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MUSTAFA-EL K.A. AJALA
f.k.a. Dennis E. Jones-El, and
SPENCER A. BROWN,

                Plaintiffs,

      v.

KELLI WEST, RICK RAEMISCH,
TODD OVERBO, CATHY JESS,
PETER HUIBREGTSE, TIM HAINES,
CHARLES COLE and ANTHONY BROADBENT,

                Defendants.

OPINION and ORDER

13-cv-184-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       In this civil lawsuit, pro se prisoners Mustafa-El K.A. Ajala and Spencer Brown allege that various prison officials have inhibited plaintiffs' ability to practice their Muslim faith. In particular, plaintiff Ajala is proceeding on claims that (1) in 2008, 2009 and 2010 defendants Anthony Broadbent, Todd Overbo, Peter Huibregtse and Richard Raemisch failed to give Ajala accommodations he needed to fast for Ramadan, in violation of the free exercise clause, the establishment clause and the equal protection clause; and (2) defendants Overbo, Broadbent, Peter Huibregtse, Tim Haines, Kelli West, Cathy Jess and Charles Cole are refusing to allow Ajala and other Muslims to have a special meal celebrating Eid al-Fitr, in violation of the Religious Land Use and Institutionalized Persons Act, the free exercise clause, the establishment clause and the equal protection clause. In addition, both plaintiffs

1

allege that defendant Overbo discriminated against them on the basis of race when he denied their 2012 request to receive Ramadan accommodations.

Both sides have filed motions for summary judgment, dkt. ##37 and 47, which are ready for review.  Having reviewed the parties' submissions, I am granting defendants' motion and denying plaintiffs' motion because the undisputed facts show that no reasonable jury could find in plaintiffs' favor on any of their claims.  However, in light of case law that I overlooked in the screening order, I am giving plaintiffs an opportunity to file supplemental materials on their claim that defendant Overbo's refusal to grant their 2012 Ramadan request violated their rights under the free exercise clause.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.  (Plaintiffs object to all of defendants' responses to their proposed findings of fact on the ground that the responses were untimely, dkt. #69 at 12, but that is incorrect.  The court extended the response deadlines for both sides to August 28, 2014, dkt. #55, and defendants filed their materials by that date.  Plaintiffs' objection is particularly weak in light of the fact that they requested and received another 11-day extension to file their response materials.  Dkt. #66.)

UNDISPUTED FACTS

Plaintiff Mustafa-El K.A. Ajala has been incarcerated at the Wisconsin Secure Program Facility in Boscobel, Wisconsin since February 10, 2007.  Plaintiff Spencer Brown was incarcerated at the Boscobel prison from June 1, 2012 until September 21, 2012.

Plaintiffs are African Americans and Muslims.

A. Request to Receive Ramadan Accommodations

Prisoners observing Ramadan must fast between sunrise and sunset. Because such a fast precludes these prisoners from eating at normal meal times and they are not permitted to keep meals in their cells, they require accommodation from the prison to receive food at the appropriate time. Each year, approximately 100 prisoners at the Boscobel prison request Ramadan accommodations. At the times relevant to this lawsuit, defendant Todd Overbo, the prison chaplain, decided whether to grant each request.

The prison has a policy called "Annual Religious Celebratory Meal/Observance." It states that "[i]nmates shall submit a written request at least 30 days in advance of date to participate in a celebratory meal. Exceptions will be considered if the inmate was received at the Institution/center less than 30 days prior." DAI Policy 309.06.01, dkt. #40-1, at 6. Officials at the Boscobel prison construe this policy as applying to requests to receive meal accommodations for Ramadan.

In 2008, 2009 and 2010, plaintiff Ajala requested Ramadan accommodations and his requests were approved.

Generally, Muslim inmates are informed of Ramadan fasting dates by a video notice and in a written memorandum. On June 20, 2012, Overbo aired a video notice stating that Ramadan would take place between July 20 and August 18. (Neither side adduced evidence on the question whether prison officials issued a written memorandum in 2012 or whether

3

plaintiffs received such a memorandum.  Plaintiffs argue that defendants admitted in their answer that no memorandum was issued in 2012, but plaintiffs' citation does not support their argument.  Rather, defendants admitted only that they issued a video notice on June 20, 2012.  Dkt. #23 at ¶ 24.)

The television notice allowed inmates until June 25 to submit Ramadan accommodation requests.  (That deadline was 25 rather than 30 days before the beginning of Ramadan.  Defendants do not explain why they  moved the deadline in 2012.)  Ajala received the June 20 television notice, but Brown did not receive the June 20 television notice because he was housed in segregation at the time and prisoners in segregation do not have access to television.

Plaintiff Ajala submitted a Ramadan meal accommodation request to defendant Overbo on June 26, 2012; plaintiff Brown submitted his request on June 29, 2012. Defendant Overbo denied both requests because they were late. Generally, Overbo denied three or four requests each year for the same reason.

Inmate Craig Sussek arrived at the Boscobel prison from the Green Bay Correctional Institution on July 19, 2012.  Sussek is white and a Muslim.  On the day he arrived at the Boscobel prison, Sussek requested Ramadan meal accommodation.  (Plaintiffs object to this proposed fact on hearsay grounds, but Sussek averred in his own affidavit that he arrived at the Boscobel prison on July 19, 2012 and requested Ramadan accommodation the same day. Dkt. #34.)  Overbo contacted the Green Bay prison chaplain, who verified that Sussek had signed up for Ramadan accommodation at the Green Bay prison prior to transferring to the

4

Boscobel prison.   (Plaintiffs object on hearsay grounds to this proposed fact as well. Although defendants cite only Overbo's declaration to support the fact that the Green Bay chaplain verified Sussek's request, Overbo's averment is not hearsay because he is not relying on it for the truth of the matter.  Fed. R. Evid. 801(c)(2).  In other words, for the purpose of this case, it does not matter whether Sussek *actually* asked for Ramadan accommodation at Green Bay, but only whether Overbo relied on the Green Bay chaplain's statement that Sussek made the request.)  Overbo granted Sussek's request.

### B.  Prison Preparation for Ramadan

Food services staff begin planning for Ramadan approximately three months in advance. Because there are more than 500 prisoners at the Boscobel prison and food production is done on a large-scale basis, careful planning is needed to avoid producing too much or too little food.

First, staff change the recipes for the general menu to take into account the number of prisoners who are not receiving normal meals during Ramadan.   Once the general institution menu recipes are changed and the menu is finalized for all three diet programs (general, plant-based and Halal) for the Ramadan meals, everything must be approved by the Department of Corrections for budgeting purposes and to insure that calorie requirements are being met.  Once all menus are approved and finalized, the necessary quantities of food need to be ordered.

Food must be ordered well in advance of Ramadan.   Food services staff want food

delivered to the prison three weeks prior to the start of Ramadan "to ensure that food is thawed per appropriate food service standards."  Dfts.' PFOF ¶ 43, dkt. #73 (Defendants do not explain why they believe that food would need such a long time to thaw, but plaintiffs do not dispute that aspect of the proposed finding of fact, so I have accepted the fact as true for the purpose of deciding the motions for summary judgment.)

Food services staff prepare Ramadan meals three to four days in advance of food delivery.  Staff do not prepare any extra Ramadan meals.  If an inmate participating in Ramadan is transferred to the Boscobel prison, food service will adjust to accommodate that inmate because it is unlikely that more than one or two inmates will need to be accommodated.  However, this adjustment will either interfere with the following day's meal or make it more difficult for kitchen staff who need to prepare extra meals with a limited food supply.

C.  Implementation of Accommodations for Prisoners Participating in Ramadan

At least since 2008, prisoners who participate in Ramadan have received cold meal bags. (Plaintiff Ajala says that, at unspecified times before 2008, he received hot meals in the evening during Ramadan.  In addition, he says that he received hot meals for Ramadan in 1998 at the Waupun Correctional Institution.)  No other group of prisoners receives hot food from the prison kitchen when it is closed.  Prisoners observing Ramadan are the only prisoners who receive "after hours" meals.

According to an information packet that the Department of Corrections receives from

the two Islamic imams, "the [Ramadan] fast begins with a light meal known as suhoor, which is taken just before the break of dawn."  Every year, defendant Anthony Broadbent (the food services administrator) receives a calendar from defendant Overbo showing the times for sunrise and sunset in Boscobel during the month of Ramadan.  He then sends a memo to each unit to specify the time that meals should be delivered to prisoners observing Ramadan, which is at least 20 minutes before sunrise.  However, plaintiff Ajala believes that the "cut off time for eating suhoor meals . . . occurs more than an hour before sunrise."  He informed defendant Overbo and defendant Peter Huibregtse (the warden at the time) of his belief in 2008.

On September 29, 2008, the daily menu for prisoners observing Ramadan consisted of food totaling between 2803 and 2879 calories.  On September 19, 2009 the menu for prisoners observing Ramadan consisted of food totaling between 2717 and 2743 calories.  On August 14, 2010, the menu for prisoners observing Ramadan consisted of food totaling between 2764 and 2767 calories.

In 2009 and 2010, plaintiff Ajala stopped fasting before the end of Ramadan on the ground that prison officials were not providing the necessary accommodations.


D.  Eid al-Fitr

Eid al-Fitr is a religious feast at the end of Ramadan to celebrate the end of fasting. Under DAI Policy #309.61.01, each religious group at a prison may gather for one religious feast each year.  The policy states that religious feasts "consist of the regular institution meal

or special symbolic religious diet meals prepared by the institution." At the Boscobel prison, prisoners who gather for Eid al-Fitr usually receive an extra "side item or dessert." (Plaintiff says that "prior to 2011" prisoners celebrating Eid al-Fitr received additional food, such as double portions.)

In 2010, defendant Overbo denied Ajala's request to participate in the Eid al-Fitr meal because plaintiff Ajala had withdrawn from participating in the Ramadan fast that year. Defendant Huibregtse affirmed that decision. In addition, Ajala was housed in segregation at the time and prisoners in segregation are not permitted to congregate for religious meals. (After the feast, the religious practices coordinator informed Overbo that prisoners could participate in Eid al-Fitr even if they did not participate in fasting.) In 2011 and 2012, plaintiff was in segregation during the Eid al-Fitr, so he was not allowed to celebrate the holiday with other prisoners.

In 2011, plaintiff Ajala complained that the meal he received on Eid al-Fitr was "the same as every other prisoner," but defendants Tim Haines (the warden) and Charles Cole (the Secretary's designee) denied the grievance. Ajala made the same complaint in 2012 and again defendants Haines and Cole denied the grievance.

## E.  Other Food Disputes

Most years around Christmas, the prison serves what defendants call a "seasonal holiday meal" in which all prisoners not on special diets are served turkey with dressing, along with food such as dinner rolls, cranberry sauce and pumpkin pie. In addition,

prisoners in general population are permitted to use their own funds to purchase "cheese and sausage boxes" from outside the institution, "usually . . . around the holidays."  Dfts.' PFOF ¶ 119, dkt. #39.

On occasion, prisoners in general population are permitted to use their own funds to purchase pizza or submarine sandwiches from outside the prison.  This activity does not correlate with any religious holiday.  In addition, all prisoners are permitted to use their own funds to purchase food from the prison canteen.


OPINION

### A.  Denial of Requests for Ramadan Accommodations

Both plaintiffs contend that defendant Overbo subjected them to race discrimination in violation of the equal protection clause when he denied their 2012 requests for Ramadan accommodations.  To prevail on this claim, plaintiffs must show that Overbo intentionally discriminated against them because of their race.  David K. v. Lane, 839 F.2d 1265, 1272 (7th Cir. 1988).  A showing of a disparate impact is not enough.  Id. at 1271-72.


### 1.  Similarly situated white prisoners

One way to prove discriminatory intent is to adduce evidence that the defendants provided more favorable treatment to similarly situated individuals in a different group. Swanson v. City of Chetek, 719 F.3d 780, 783-85 (7th Cir. 2013).  "[T]o be similarly situated, comparators must be . . . prima facie identical in all respects."  Srail v. Village of

Lisle, Ill., 588 F.3d 940, 945 (7th Cir. 2009).

In their complaint, plaintiffs pointed to Craig Sussek, a white prisoner whom defendant Overbo allowed to participate in Ramadan even though Sussek's request was late. However, I agree with defendants that plaintiffs have not shown that they were similarly situated to Sussek. First, unlike both plaintiffs, Sussek was not transferred to the Boscobel prison until after the deadline. Second, with respect to plaintiff Ajala, it is undisputed that he failed to submit a timely request even though he had notice in advance of the deadline. In contrast, Overbo received information from Sussek's previous prison that Sussek had submitted a timely request before his transfer and then renewed his request immediately after his transfer. Thus, Sussek did everything he could have done.

With respect to plaintiff Brown, the facts are less clear regarding whether he received notice. Although it is undisputed that he did not receive a video notice, neither side submitted specific evidence on the question whether he received a written memorandum or whether he knew about the requirement to request accommodations because of his requests in previous years. (The closest defendants came to alleging that they had issued a written notice was to say that they issued such a notice "each year." Dfts.' PFOF ¶ 21, dkt. #73). This is a problem for Brown because he has the burden to prove his claim; defendants do not have the burden to disprove it. Borello v. Allison, 446 F.3d 742, 748 (7th Cir. 2006) ("Plaintiff had the burden to go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial."); Metzl v. Leininger, 57 F.3d 618, 622 (7th Cir. 1995) ("When there is no evidence

10

concerning a critical fact . . . the allocation of the burden of production of evidence becomes critical."). <u>See also</u> Advisory Committee Notes on 2010 Amendments to Fed. R. Civ. P. 56 ("[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). Thus, without evidence from plaintiff Brown that he did not have notice of the deadline, a jury could not reasonably infer that Brown and Sussek were similarly situated.

Even if I assume that Brown had not received notice, he still would not be similarly situated to Sussek. Under DAI Policy 309.06.01, the Department of Corrections has singled out prison transfers as a ground for making an exception to the deadline because those prisoners have no way of making a timely request and because the number of those prisoners each year will be very small and thus more easily accommodated. If prisoners could obtain an extension simply by claiming a lack of notice, it is likely that the number of untimely requests would increase substantially. Accordingly, I conclude that defendant Overbo's decision to act in accordance with policy by accepting Sussek's request but denying Ajala's and Brown's request is not evidence of race discrimination.


2.  <u>"Historical background"</u>

In their summary judgment materials, plaintiffs rely primarily on what they see as a history of racism at the Boscobel prison. For example, in their proposed findings of fact, plaintiffs allege that Overbo showed two videos and one slide show at the Boscobel prison

11

that demonstrate his discriminatory intent:

> While the Chaplain at [the Boscobel prison], during 2010-2012 (and even prior) Defendant Overbo often showed religious videos and slides promoting White racial superiority and purity and Black racial inferiority, three of which are the following: (i) "Asatru Alliance" video, with image of a swastika as follows: [drawn image of swastika], played by Overbo repeatedly, played on 1-23-10, and is still played from time to time, promotes White race separatism, and purity, superiority; (ii) A racist slide show of Blacks in poverty, slums, as slaves, one stating "Reward $100 – my slave Matthew Turner, ran away, April 1, 1845, from Prince George County, Mary-land (a slave notice), and the same slide, no audio, just visuals, no commentary, no other caption, shows whites in political office, in power, regalia, etc., and others of us (Blacks) with our hands raised up (for arrest) and in line-ups – the message is clear, and it shows still, and did on 2-13-10, by Overbo (on 2-13-10), on the religious program channel; and (iii) Another White race superiority, purity, Christian video, white mail speaker, the name of which is not now known to plaintiffs, but it is played regularly.

Plt.'s PFOF, dkt. #49, ¶ 13.

This proposed finding of fact is problematic for multiple reasons. First, plaintiffs do not allege that they have personally viewed the videos they discuss, so their allegations lack foundation. More important, plaintiffs offer nothing but conclusory allegations to support their argument that the videos are evidence that Overbo is racist. Sublett v. John Wiley & Sons, Inc., 463 F.3d 731, 740 (7th Cir. 2006) ("[I]t is . . . axiomatic that a plaintiff's conclusory statements do not create an issue of fact. . . ."). Because images of a swastika or slavery could appear in any number of historical or educational videos, a reasonable jury could not infer without additional context that Overbo is "promoting white racial superiority" simply because he allows prisoners to watch videos that contain those images.

Plaintiffs also make assertions regarding the racial make-up of the Boscobel prison staff and racial slurs that prison staff members have directed at plaintiff Ajala. Plt.'s PFOF,

dkt. #49, ¶ 14.   However, these allegations are irrelevant because they do not involve defendant Overbo, the only named defendant in plaintiffs' equal protection claims.


3.  Misapplication of prison policy

Plaintiffs argue next that defendant Overbo's misapplication of prison policy is evidence of race discrimination.   Hanners v Trent, 674 F.3d 683, 694 (7th Cir. 2012) ("Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence  of discriminatory intent."). In particular, they argue that the 30-day deadline in DAI Policy 309.61.01 applies only to requests to participate in "celebratory meals" and Ramadan is a month-long fast rather than a "celebratory meal."

This argument is a red herring. Even if I assume that DAI Policy 309.61.01 does not encompass Ramadan, it is undisputed that officials at the Boscobel prison have an established practice of requiring advance notice for Ramadan accommodation.   Thus, defendant Overbo's decision to continue that practice in 2012 is not evidence of discriminatory intent.


4.  Conyers v. Abitz

Finally, plaintiffs cite Conyers v. Abitz, 416 F.3d 580, 585 (7th Cir. 2005), another case in which officials denied a prisoner's request to receive Ramadan accommodations on the ground that the request was late.   The case addressed the scope of the prisoner's rights

under the free exercise clause and the case had nothing to do with race discrimination, so it cannot help plaintiffs defeat defendants' motion for summary judgment.  However, the case does suggest that I should reevaluate plaintiffs' claim that defendant Overbo violated the free exercise clause by refusing to accept their late requests, a claim that I dismissed in the screening order.

In Conyers, the district court had dismissed the case on the ground that the prisoner had failed to exhaust his administrative remedies, but the court of appeals disagreed.  Alternatively, the defendants argued on the merits that they were entitled to enforce their deadline.  However, the court of appeals concluded that further proceedings were necessary because the defendants' "summary judgment evidence [wa]s too poorly developed to support a decision in their favor."  Conyers, 416 F.3d and 585.

I did not consider Conyers in the screening order.  Rather, I dismissed plaintiffs' free exercise claim in part on the ground that defendants were entitled to impose a deadline on prisoners who wished to receive Ramadan accommodations. (I also concluded that plaintiffs' free exercise claim was inconsistent with the test set forth in Employment Division, Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990), which is discussed in the next section.  However, the court of appeals did not consider in Conyers whether Smith applied.)

Plaintiffs did not seek reconsideration of the dismissal of their free exercise claim on the ground that it was inconsistent with Conyers and they do not seek reconsideration now.  Even if they had, it is probable that I would conclude that Conyers is distinguishable, for

14

three reasons.  First, in <u>Conyers</u>, 416 F.3d at 586, it appeared to be undisputed that prison officials had not given the prisoner notice of the deadline.  In this case, neither plaintiff has adduced evidence that he was unaware of the deadline.  Second, in <u>Conyers</u>, the defendants had failed to develop evidence showing the reasons for the deadline.  In this case, defendants have explained in detail the advance planning that is required for preparing the prisoners' meals.  <u>Id.</u> at 585.  Third, in <u>Conyers</u>, the court noted that the defendants had failed to explain why they denied the plaintiff's request even though they allowed late requests from prisoners who were transferred to the prison after the deadline.  <u>Id.</u>  In this case, defendants have explained why they provide accommodation to new transfers but not to persons in plaintiffs' situation.

Accordingly, even if I had not dismissed plaintiffs' free exercise claim in the screening order, it is likely that defendants would be entitled to summary judgment on that claim now.  However, because plaintiffs may not have anticipated that I would reconsider their free exercise claim, I will give them an opportunity to explain why they believe they should be allowed to proceed on that claim in light of <u>Conyers</u>.  In particular, they will be required to show that defendant Overbo's decision to deny their requests was not reasonably related to legitimate penological interests.  <u>Conyers</u>, 416 F.3d at 585; <u>Maddox v. Love</u>, 655 F.3d 709, 719-20 (7th Cir. 2011); <u>Ortiz v. Downey</u>, 561 F.3d 664, 669 (7th Cir. 2009).

## B.  Implementation of Ramadan Accommodations

In 2008, plaintiff Ajala participated in the Ramadan fast, but he says that defendants

did not provide the accommodations they should have to help him sustain the fast.  In particular, Ajala argues that defendants:  (1) did not serve his morning meals early enough; (2) did not provide him enough food; and (3) provided cold meals instead of hot ones. Because plaintiff Ajala alleged that defendants took these actions in an attempt to deter him and other Muslims from participating in Ramadan, I allowed him to proceed on claims under the free exercise clause, the establishment clause and the equal protection clause.  (Ajala asserted a RLUIPA claim as well, but I dismissed that claim because RLUIPA claims are limited to prospective relief, <u>Vinning-El v. Evans</u>, 657 F.3d 591, 592 (7th Cir. 2011), and Ajala did not allege in his complaint that the problems persisted in more recent years.)

Plaintiff Ajala has not adduced sufficient evidence to allow a reasonable jury to find in his favor with respect to any of the perceived refusals to accommodate him.  With respect to the time morning meals were delivered, a potential threshold problem is that Ajala has not shown that defendants were providing more favorable treatment to prisoners of other faiths or were otherwise intentionally discriminating against Muslims.  The Supreme Court has held that the free exercise clause does not require the government to accommodate religious exercise so long as the government is applying a neutral rule that applies to everyone the same regardless of religion.  <u>Employment Division, Dept. of Human Resources of Oregon v. Smith</u>, 494 U.S. 872 (1990).  <u>See also</u> <u>Grayson v. Schuler</u>, 666 F.3d 450, 452-53 (7th Cir. 2012) (stating in dicta that <u>Smith</u>'s "holding should apply to prison inmates along with everyone else"); <u>Borzych v. Frank</u>, 439 F.3d 388, 390 (7th Cir. 2006) (in prisoner civil rights case, stating that "[t]he first amendment . . .  does not require the accommodation of

16

religious practice: states may enforce neutral rules.").  Similarly, Ajala's claims under the establishment clause and the equal protection clause would require him to show that defendants were targeting Muslims for adverse treatment or were giving more favorable treatment to prisoners of other faiths.  Kaufman v. Pugh, 733 F.3d 692, 696 (7th Cir. 2013) ("[T]he Establishment Clause may be violated . . . if the government favors one religion over another (or religion over nonreligion) without a legitimate secular reason for doing so."); Herro v. City of Milwaukee, 44 F.3d 550, 552 (7th Cir. 1995) (equal protection clause requires showing of intentional discrimination).  However, it is undisputed that Muslim prisoners are the only group who receive meals outside the regular meal times, so Ajala cannot show that defendants were discriminating against him by refusing to deliver meals at his requested time.

In some cases, the Court of Appeals for the Seventh Circuit has stated that it remains an open question whether Smith applies in the prison context, or, in other words, whether the free exercise clause requires officials to accommodate a prisoner's religious exercise even in the absence of discriminatory treatment.  E.g., Lewis v. Sternes, 712 F.3d 1083, 1085 (7th Cir. 2013) ("Whether there is a constitutional . . . right to a religious accommodation is an open question. . . because of the tension between . . . O'Lone v. Shabazz, 482 U.S. 342, 348–50, (1987), . . . which create[s] a First Amendment duty of religious accommodation in prisons, and . . . Smith . . ., which denies a constitutional duty of religious accommodation in broad terms yet without overruling O'Lone."); Vinning-El, 657 F.3d at 593 ("The Supreme Court has never considered how Smith applies to prisons and whether

17

it supersedes [O'Lone] when a prisoner seeks an accommodation.")    In other cases, such as Conyers, 416 F.3d 580, the court of appeals has assumed without discussing Smith that prisoners have a right under the free exercise clause to religious accommodation.  However, even if I assume that there is a right of religious accommodation in prison, plaintiff Ajala cannot prevail on his claim.

It is undisputed that defendants *did* accommodate the religious exercise of Muslim prisoners during Ramadan by directing staff to distribute meals at least 20 minutes before sunrise to Muslim prisoners fasting and that defendants relied on the instruction of two imams in determining the appropriate time to deliver meals.  Plaintiff Ajala does not dispute these facts, but he says that defendants should be delivering meals earlier.  In particular, he says that his interpretation of Islam requires him to begin fasting more than an hour before sunrise.  Ajala Aff. ¶ 8, dkt. #71 ("[T]he Fajr time precedes the sunrise time by more than an hour.  Fajr is the 'dawn prayer' start time and fasting Muslims are not permitted to eat their suhoor [morning] meal beyond this time.").

Prison officials may not deny a religious request simply because they believe the request is unorthodox or not actually required by the religion at issue. E.g., Grayson,  666 F.3d at 453-54.  However, when a religious accommodation requires officials to expend additional resources, officials are permitted to consider the burden imposed on the prison and the extent to which a prisoner's belief is shared by others.  Kaufman, 733 F.3d at 698 ("We can assume that . . . the prison has no duty to recognize every minor religion or belief system that attracts at least two inmates.").  For example, in Kaufman, the court cited with

18

approval a nonprecedential opinion in which the court concluded that prison officials were not required to accommodate a prisoner's "idiosyncratic" belief regarding the date that Ramadan began.  Id. at 699 (citing Easterling v. Pollard, 528  Fed. Appx. 653 (7th Cir. 2013)).  If prison officials had to accommodate every individual belief of every prisoner, the corresponding burden on prison resources would be overwhelming and would undermine officials' ability to accommodate *any* religious requests.  Maddox, 655 F.3d at 718-19 ("Prisons need not provide every religious sect or group within a prison with identical facilities or personnel . . . . After all, if a budget for religious-related matters were to be divided too many ways, the result could be an inadequate provision of religious access for the prisoners as a whole.").

In this case, defendants relied on two imams in determining the appropriate time to deliver food.  Plaintiff Ajala does not identify any other prisoners at his institution who share his belief that Muslims must stop eating more than an hour before sunrise during Ramadan. Accordingly, I decline to hold that defendants violated the Constitution by failing to either change the food delivery time for all Muslim prisoners or devote resources to delivering a single meal just for Ajala.  At the least, defendants are entitled to qualified immunity because Ajala has not cited any case law showing that it is clearly established that defendants violated plaintiff's rights under the free exercise clause, the establishment clause or the equal protection clause.  Pearson v. Callahan, 555 U.S. 223, 231 (2009) ("The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

19

reasonable person would have known.") (internal quotations omitted).

With respect to the amount of food plaintiff Ajala received during Ramadan, it is undisputed that he received two meals each day, one before sunrise and one after sunset. Ajala says that non-Muslims received three daily meals, but this is not evidence of discrimination because the difference in treatment was the result of Ajala's own decision to fast. Plaintiff cites no evidence that a *similarly situated* prisoner (a prisoner of another faith who chose to fast) would have received more favorable treatment.

Again, even assuming that plaintiff was entitled to an accommodation, he has not shown that he suffered a constitutional deprivation. According to defendants, the two daily meals that Muslim prisoners receive during Ramadan contain approximately the same number of calories as the three daily meals that non-Muslim prisoners receive. Defendants provided sample menus from each of the years at issue showing that prisoners participating in Ramadan received at least 2700 calories a day.

Plaintiff Ajala does not suggest that 2700 calories is inadequate; instead, he attempts to dispute defendants' evidence by alleging that, during Ramadan, he received the equivalent of "approximately one whole meal less" than non-Muslim prisoners and that each year he "lost weight, up to 10 lbs., due to the reduction in the amount of food." Ajala Aff. ¶ 7, dkt. #71. However, Ajala does not provide any foundation for his conclusory allegations. In other words, he does not explain how he determined that he was receiving less food and lost weight and that any weight he lost was caused by a reduction in food. Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003) (conclusory allegations unsupported by specific facts will not

suffice to defeat summary judgment).   Perhaps it would be reasonable to infer from Ajala's affidavit that he lost *some* amount of weight, but even if that were the case, he provides no facts from which it could be inferred reasonably that he was not receiving nutritionally adequate food.  Nelson v. Miller, 570 F.3d 868, 879 -880 (7th Cir. 2009) ("[A] prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition.").  To the extent that Ajala means to argue that defendants violated his rights simply because they gave him two meals instead of three, that argument is without merit.  So long as Ajala received nutritionally adequate food, he was not entitled to a third meal at some point in the middle of the night.  Accordingly, I conclude that defendants are entitled to summary judgment on this claim as well.

Plaintiff Ajala's claim that defendants violated his constitutional rights by giving him cold meals rather than hot ones is without merit.  Charles v. Verhagen, 01-C-253-C, 2001 WL 34373015 (W.D. Wis. June 11, 2001) (dismissing claim that prisoner was entitled to hot meals during Ramadan) (citing Wiggins v. Alameda County Board of Supervisors, No. C 94–1172 VRW, 1994 WL 327180 (N.D. Cal. June 22, 1994); Reed v. Banta, Civ. A. No. 91–2867, 1991 WL 80418 (E.D. Penn. May 9, 1991)).  It is undisputed that prisoners observing Ramadan received cold meals because the prison kitchen was closed at the times that the prisoners needed to eat.  The parties debate the difficulty of cooking or reheating meals before delivering them, but this argument misses the point.  Ajala does not cite any evidence that other prisoners fasting received more favorable treatment, so it is not reasonable to infer that any failure by defendants to provide hot meals is the result of anti-

21

Muslim animus.

Even if I assume that the free exercise clause requires officials to accommodate a prisoner's religious practices, Ajala does not suggest that the difference between cold and hot meals has *any* religious significance in Islam, so he cannot argue successfully that his ability to practice his religion was burdened.  Accordingly, I am granting defendants' motion for summary judgment with respect to all of plaintiff Ajala's claims that defendants failed to accommodate his decision to observe Ramadan in 2008, 2009 and 2010.

### C.  Eid al-Fitr

Plaintiff Ajala alleged in his complaint that defendants are refusing to allow Muslim prisoners to have an "Eid al-Fitr meal" and that defendants are allowing Christian prisoners to purchase holiday meals from outside the prison, but they are not allowing Muslim prisoners to do the same thing.  I allowed plaintiff to proceed on these claims under RLUIPA, the free exercise clause, the establishment clause and the equal protection clause. (I allowed Brown to proceed on the same claims, but I later granted defendants' unopposed motion for summary judgment on the claims with respect to Brown on the ground that Brown had not exhausted his administrative remedies as required by 42 U.S.C. § 1997(a). Dkt. #33.)

It is undisputed that, in 2010, defendant Overbo denied plaintiff Ajala's request to attend the Eid al-Fitr celebration because he did not participate in Ramadan and that, in 2011 and 2012, plaintiff was not allowed to attend because he was in segregation.  Ajala did

not include claims in his complaint that he had a right to participate in Eid al-Fitr when he did not complete the Ramadan fast or was housed in segregation and he does not develop arguments in his summary judgment materials regarding these issues.  Accordingly, I conclude that Ajala has forfeited any claims regarding his inability to attend Eid al-Fitr in 2010, 2011 and 2012.  The parties do not say whether Ajala asked to participate in the Eid al-Fitr celebration in 2013 or 2014 or whether he was in segregation at the relevant time those years, but I will assume for the purpose of the parties' motions for summary judgment that he was eligible to attend Eid al-Fitr and that he did so.

Plaintiff Ajala's claim regarding Eid al-Fitr has two components.  First, he challenges the policy of providing the "regular institutional meal" for Eid al-Fitr rather than special food.  Second, he says that defendants are discriminating on the basis of religion by having a turkey dinner to celebrate Christmas and by allowing prisoners to use their own funds to purchase certain foods from outside vendors.

With respect to the department's policy of not providing special food for Eid al-Fitr, plaintiff Ajala's claim under RLUIPA and the free exercise clause fails because he has not adduced evidence that the type of food served at Eid al-Fitr has any religious significance. 42 U.S.C. § 2000cc-1 (under RLUIPA, prisoner must show that defendants are imposing "substantial burden" on "religious exercise"); Thomas v. Review Board, 450 U.S. 707, 713 (1981) ("Only beliefs rooted in religion are protected by the Free Exercise Clause.").  The same conclusion follows for his claim that defendants are refusing to allow Muslim prisoners to order food from outside the prison.  Plaintiffs cite Ford v. McGinnis, 352 F.3d 582 (2d

23

Cir. 2003), for the proposition that a Muslim's right to celebrate Eid al-Fitr is clearly established, but  Ford  is not instructive because the court did not hold that prisoners are entitled to a specific type or amount of food to accompany their celebration.

This leaves plaintiff Ajala's claims that defendants are violating the Constitution by providing special meals for Christian prisoners, as well as allowing those prisoners to order food from outside vendors.  Defendants' response to these claims is that Christian prisoners do not have any celebratory meals and that the "holiday" meal is provided to *all* prisoners who are not on a special diet, not just Christians.  Along the same lines, prisoners of all faiths are permitted to order food from approved vendors outside the prison.

Plaintiff Ajala does not deny that Christian prisoners do not congregate for any religious meals and that the meals and additional food at issue are available to prisoners regardless of their religion.  Rather, Ajala's argument seems to be that defendants are violating the Constitution by providing special food around that holiday without doing the same at Eid al-Fitr.

I will assume for the purpose of defendants' motion for summary judgment that defendants offer special food at Christmas as a way of acknowledging or even celebrating that holiday.  However, that assumption does not help plaintiff Ajala.  Both the Supreme Court and the Court of Appeals for the Seventh Circuit have held that the establishment clause does not prohibit the government from celebrating Christmas in all respects.  Their reasoning is that although Christmas has religious origins, its celebration by the government does not necessarily connote endorsement in the eyes of the reasonable observer because of

24

the significant secular meaning the holiday now has.  County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 615 (1989); Metzl, 57 F.3d at 620.  See also Kaufman v. Frank, 03-C-27-C, 2003 WL 23277423 (W.D. Wis. Mar. 27, 2003) (selling Christmas cards in prison canteen did not violate establishment clause, even though prison did not offer other holiday cards);  Blagman v. White, 112 F. Supp. 2d 534, 540–41 (E.D. Va. 2000) (prison "observances of such traditional holidays as Christmas and Thanksgiving do not rise to the level of violations of the Establishment Clause" because "the law has come to recognize that many typical Thanksgiving and Christmas holiday observances are essentially secular in nature"); Torricellas v. Poole, 954 F. Supp. 1405, 1411–12 (C.D. Cal.1997), aff'd, 141 F.3d 1179 (9th Cir. 1998) (prison Christmas party did not violate establishment clause).

Thus, so long as prison officials limit their acknowledgment or celebration of Christmas to the secular aspects of the holiday, their conduct does not violate the establishment clause. In this case, there is no suggestion that the food provided or offered by defendants around Christmas has any religious significance.  Accordingly, I conclude that defendants are entitled to summary judgment on this claim as well.

Finally, with respect to plaintiff Ajala's claim under the equal protection clause, Ajala has not adduced evidence that similarly situated prisoners are receiving more favorable treatment.  No prisoners are provided special food when they congregate for a religious celebration; all prisoners not on a special diet receive the same meals throughout the year; and all prisoners regardless of religion have the same privileges regarding ordering food from

outside the prison.  Ajala says that his religious beliefs prohibit him from eating the foods that are available from outside the prison, but that is an argument about a disparate *impact* on prisoners who share Ajala's beliefs, not disparate treatment.  Under the equal protection clause, a disparate impact is not enough to prove a claim.  Adams v. City of Indianapolis, 742 F.3d 720, 726 n.3 (7th Cir. 2014) ("[T]he Supreme Court's equal-protection jurisprudence does not recognize a claim for disparate impact.").  Because Ajala has not adduced any evidence that defendants are intentionally discriminating against him because he is a Muslim, he cannot prevail on his equal protection claim.

ORDER

IT IS ORDERED that

1.  The motion for summary judgment filed by defendants Anthony Broadbent, Todd Overbo, Charles Cole, Tim Haines, Peter Huibregtse, Cathy Jess, Rick Raemish and Kelly West, dkt. #37, is GRANTED.

2.  The motion for summary judgment filed by plaintiffs Mustafa-El K.A. Ajala (formerly known as Dennis Jones-El) and Spencer Brown, dkt. #47, is DENIED.

3.  Plaintiffs may have until November 28, 2014, to file supplemental materials on the question whether they should be permitted to proceed with their claim that defendant Overbo violated the free exercise clause by refusing to accept their 2012 requests for Ramadan accommodations.  If plaintiffs do not respond by that date, I will direct the clerk

of court to enter judgment in favor of defendants on all of plaintiffs' claims.

Entered this 4th day of November, 2014.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge